**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**v.**<br><br>**WALDEMAR LORENZANA-LIMA,**<br><br>**Defendant.** | **Criminal No. 03-331-11 (CKK)** |

**MEMORANDUM ORDER**
**(February 21, 2020)**

Pending before this Court is the Government's [1096] Motion for Sentencing Enhancements, which requests that this Court impose a four-level sentencing enhancement for leadership and a two-level sentencing enhancement for use of an aircraft in calculating the Defendant Waldemar Lorenzana-Lima's guideline range pursuant to 18 U.S.C. § 3553(a)(4). In support of its request for sentencing enhancements pursuant to the Sentencing Guidelines, the Government has provided the Defendant and this Court with excerpts of testimony — from the trial of Defendant's co-defendants and sons, Eliu Elixander Lorenzana-Cordon and Waldemar Lorenzana-Cordon — by witnesses Otto Herrera-Garcia ("Herrera-Garcia") and Byron Linares-Cordon ("Linares-Cordon"), with such excerpts being proffered in lieu of live testimony.[1] The Court notes that the undersigned presided over the trial of these co-defendants and listened to the testimony of these witnesses and their cross-examination by co-defendants' counsel. Furthermore, in connection with the sentencings of these two co-defendants, the Government sought the same enhancements at issue here, which were applied at their sentencings. The co-defendants' convictions were recently upheld by the Court of Appeals for the District of Columbia Circuit. *See*

[1] The Government refers to Byron Linares (a co-defendant in Criminal Action No. 03-331) as Byron Linares-Cordon in its Motion.

*United States v. Lorenzana-Cordon*, No. 18-3019 (consolidated with No. 18-3033), --F.3d- - , 2020 WL 499217 (D.C. Cir. Jan. 31, 2020).

In September 2019, in response to being informed of a dispute between the parties as to whether the Government must present witnesses in support of the proposed enhancements, the Court issued an Order finding that the Government may rely upon trial testimony from the co-defendants' trials in support of its recommended sentencing enhancements for leadership and use of an aircraft. *See* September 5, 2019 Order, ECF No. 1094 (noting that hearsay evidence may be used in sentencing a defendant if the evidence is reliable and defendant has an opportunity to challenge it). The Government was instructed to file a motion in support of the recommended sentencing enhancements and to provide Defendant Waldemar Lorenzana-Lima ("Defendant" or "Mr. Lorenzana-Lima") with a copy of the trial transcript excerpts on which it intended to rely.

Thereafter, Defendant filed a [1097] Motion for [the Government to present] Live Witnesses at Sentencing, which was treated as a motion for reconsideration of this Court's September 5, 2019 Order and was denied by the Court. *See* November 22, 2019 Memorandum Order, ECF No. 1102 (noting that the Defendant was not prohibited from presenting live witnesses at an evidentiary hearing in connection with the sentencing, if the Defendant elected to do so). During a telephone conference with counsel two days earlier, Defendant's counsel had indicated that he was considering obtaining witness testimony from Defendant's sons/co-defendants. Defendant was instructed to file a Notice to inform the Court if the testimony seemed likely, but no Notice has been filed.

On January 19, 2020, Defendant moved for the production of non-testimonial statements by Otto Herrera-Garcia and Byron Linares-Cordon. On February 4, 2020, this Court issued a [1109] Memorandum Order denying Defendant's Motion for Production of Non-Testimonial

Statements, on grounds that the Jencks Act, 18 U.S.C. § 3500, does not encompass non-testimonial statements, nor did Defendant cite any other authority warranting the production of such statements.

In his [1108] Memorandum in Aid of Sentencing, Defendant reiterates his objections to the use of transcript excerpts and cites to the Commentary to Guideline § 6A1.3, which discusses ensuring that parties have an adequate opportunity to present information relevant to the sentencing determination; notes that an evidentiary hearing is sometimes needed to resolve disputed issues; and indicates that any information may be considered so long as it is reliable enough to support its probable accuracy. *See* Def,'s Mem. in Aid of Sentencing, ECF No. 1108, at 3 (referencing the Commentary to Guideline § 6A1.3). Ultimately, it is "[t]he sentencing court [who] must determine the appropriate procedure [for resolving disputes relevant to the sentencing determination] in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law." *Id.*

Accordingly, in this Memorandum Order, this Court will address the Government's [1096] Motion for Sentencing Enhancements and the Defendant's objections to the Government's proposed sentencing enhancements, which are set forth in his [1108] Memorandum in Aid of Sentencing.[2]

---

[2] Considered by this Court in connection with the Government's [1096] Motion for Sentencing Enhancements ("Govt.'s Mot. for Sentencing Enhancements") and the exhibits attached thereto are the following documents: (1) The Government's [1095] Memorandum in Aid of Sentencing (Govt.'s Mem. in Aid of Sentencing") (2) Defendant's [1108] Memorandum in Aid of Sentencing ("Def.'s Mem. in Aid of Sentencing"); and the entire record in this case.

## I. Background

### A. Procedural History[3]

On March 10, 2009, an Indictment was returned against Defendant by a federal grand jury sitting in this district. The Indictment charged that, from around 1996 and continuing to and including 2009, Defendant conspired with others to commit the following offenses: (1) to unlawfully, knowingly and intentionally import five kilograms or more of a mixture or substance containing a detectable amount of cocaine into the United States; and (2) to knowingly and intentionally manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such substance would be unlawfully imported into the United States, all in violation of 21 U.S.C. §§ 952, 959, 960, 963, and 960(b)(1)(B)(ii) and 18 U.S.C. § 2.

Mr. Lorenzana-Lima was arrested in Guatemala on April 26, 2011; he was extradited to the United States on March 18, 2014, and he had his initial appearance on March 20, 2014, where he was held without bond. The Court held multiple status conferences during the period the parties were drafting a Protective Order, filing motions, exchanging discovery, and discussing a possible plea deal. By means of a July 22, 2014 Minute Order, this Court scheduled a trial in this case for January 5, 2015. On August 18, 2014, Mr. Lorenzana-Lima pleaded guilty to the lesser included offense and the penalty provision of 21 U.S.C. § 960 (b)(2) in Count One of the Third Superseding Indictment, which charges Defendant with conspiracy to import five hundred (500) grams or more of cocaine into the United States, and to manufacture and distribute five hundred (500) grams or

[3] Much of the information in the Background section is derived from the background information provided in the Govt.'s Mem. in Aid of Sentencing, as supplemented by the record in this case.

more of cocaine, intending and knowing that the cocaine will be unlawfully imported into the United States, all in violation of 21 U.S.C. §§ 952, 959, 960, and 963.[4]

At the plea hearing, Defendant contested some of the facts previously agreed to in the signed Statement of Facts, and he minimized his role in the drug trafficking conspiracy and shifted responsibility to his co-defendants. *See generally* Transcript of Plea Hearing, ECF No. 523. Ultimately, in response to questions by the undersigned, Defendant acknowledged his role in the conspiracy as follows: (1) that he owned property in Guatemala, which he permitted his sons to use, along with the Herrera group, for storage of cocaine until it was moved; (2) he knew that the Herrera group was selling to Mexicans, and that his sons were being paid by the Herrera group in dollars, which gave him notice that the drugs were going to the United States; and (3) he knew it was illegal to transport cocaine. *See id.* Transcript of Lorenzana-Lima Plea Hearing, ECF No. 500, at 59-64.

On January 22, 2015, the Court ordered that Defendant be examined by a member of the psychiatric staff at the Forensic Legal Services Division, who was to provide a written report in February 2015. Defendant's sentencing date was vacated, and a mental competency hearing was set for April 13, 2015. On February 26, 2015, this Court ordered that Mr. Lorenzana-Lima be transferred to the Federal Correctional Medical Facility in Butner, North Carolina ("Butner FMC') for a competency evaluation for sentencing pursuant to 18 U.S.C. §§ 4241, 4247. On November 13, 2015, this Court issued an Order noting that it had received a forensic evaluation of Defendant

[4] The Joint Statement of Stipulated Facts accompanying the Plea Agreement indicates that the conspiracy existed "[f]rom in or about March 1996 and continuing thereafter up to and including April 2009" and further, that Defendant "was a member of a drug trafficking organization ("DTO") which, from in or about March 1996, and continuing until at least November 2007, would receive, inventory an store large quantities of cocaine from Colombia that would later be illegally imported into Mexico, an ultimately, into the United States[.]" Joint Statement of Stipulated Facts, ECF No. 501, at 1-2.

that included a Certificate of Restoration of Competency. *See* Order, ECF No. 649. The Court directed that the parties indicate their positions as to this finding of competency by Butner FMC, and shortly thereafter, Defendant notified the Court that he intended to challenge the finding of competency. *See* Notice by Defendant, ECF No. 652. On May 13, 2016, Defendant submitted his [827] Notice of Filing that was accompanied by a Neuropsychology Consultation — based on a review of records as opposed to an in-person consultation — in support of Defendant's position. The Court set a January 5, 2017 status conference to discuss the next steps to be taken in advance of a mental competency hearing and/or sentencing, and at that hearing, Defendant indicated that he intended to undergo an in-person mental health evaluation and would file a report thereafter.

Thereafter, Defendant sought permission for an additional evaluation by a Spanish-speaking expert, which the Court approved, and the Government requested that mental health professionals at Butner FMC re-examine Defendant, with the assistance of a Spanish-speaking evaluator, in light of the report provided by Defendant's Spanish-speaking expert and the time that had elapsed. On July 26, 2017, the Court ordered that Butner FMC conduct an additional evaluation, with a report to be submitted. In November 2017, the Butner FMC treatment team opined that Defendant was "right at the threshold of competency" and "would benefit from ongoing restoration efforts specifically presented to him in Spanish" and requested permission for another period of evaluation and treatment. *See* November 15, 2017 Order, ECF No. 973, at 2 (discussing the information received from Butner FMC and setting a telephonic status conference with counsel). Defendant was committed ultimately to the custody of Butner FMC for a competency restoration period.

The Butner FMC treatment team issued a finding of competency in August 2018, which the Defendant sought to challenge. *See* Defendant's [1040] Notice Regarding Finding of

Competency (indicating Defendant intended to contest the finding.) This Court set a September 28, 2018 competency hearing during which each side would be permitted to present witnesses. On September 25, 2018, Defendant filed a [1055] Notice indicating that he would not contest Butner FMC's finding of competency and accordingly, would not present an expert witness at the competency hearing. On September 28, 2018, the Court convened a Competency/Evidentiary Hearing, where Defendant was present in the courtroom and Dr. Stribling-Riley from Butner FMC testified via videoconferencing. The hearing continued to October 1, 2018, but it was adjourned without resolution because Defendant's testimony raised some issues regarding the finding of competency. Defendant did not proffer any other witnesses. The Court ordered that Defendant would be returned to Butner FMC for a limited period of treatment with Dr. Stribling Riley and restoration of his competency prior to the continuation of any competency hearing. *See* October 3, 2018 Order, ECF No. 1059.

On March 29, 2019, this Court received a report from Dr. Stribling Riley indicating that Defendant's competency had been restored, and the Court requested that counsel indicate whether this finding was contested or not. *See* March 29, 2019 Minute Order. On June 21, 2019, Defendant filed a [1089] Notice indicating that he would not contest the findings of competency. In light of the finding of competency by Dr. Stribling Riley and Defendant's voluntary concession thereto, this Court deemed Defendant competent to understand the nature and consequences of the proceedings against him and to assist properly in his defense. *See* July 29, 2019 Order, ECF No. 1093. This matter was set for sentencing in September 2019, and the Government filed its Memorandum in Aid of Sentencing and the instant Motion for Sentencing Enhancements. Because Defendant indicated that he contemplated filing a motion to withdraw his plea, the Court set a deadline of January 27, 2020 for the Defendant to file such motion or alternatively, file his

Memorandum in Aid of Sentencing, and the Court rescheduled Defendant's sentencing for February 11, 2020. On January 27, 2020, Defendant filed a Memorandum in Aid of Sentencing, and the case is now ready to proceed to sentencing, but the sentencing has been rescheduled for February 24, 2020.

**B. <u>Defendant's Conduct</u>**

The following information is derived from the Government's Motion, which relies on the Presentence Report filed by the United States Probation Office on September 19, 2014, which was updated on August 29, 2019. Defendant contests the Government's reliance on the "relevant conduct in the presentence report," noting that it "merely parrots information provided to [the] PSR writer by the government." Def.'s Mem. in Aid of Sentencing, ECF No. 1108, at 2. The Court includes this information as additional background information.

Defendant was a leader of a drug trafficking organization ("DTO") which, from around March 1996 and continuing until at least November 2007, received, inventoried and stored large quantities of cocaine from Colombia that would be imported into Mexico, and ultimately, into the United States for further distribution.[5] Amended Presentence Report ("Am. PSR") ¶ 15. Some of the cocaine came into El Salvador via "go-fast" boats from Colombia, and then it was smuggled into Guatemala by land. *Id.* The DTO also used cocaine-laden aircraft to land on clandestine airstrips located on or near properties owned and used by the DTO, including Mr. Lorenzana-Lima. *Id.* The DTO, including Defendant, received, inventoried, stored and further distributed the cocaine for importation into the United States, and Defendant was paid a fee for each shipment of cocaine that conspiracy members received, stored, transported and sold on the Defendant's

[5] In 2006, Defendant noted that he suffered a heart attack and underwent surgery in Guatemala. *See* Am. PSR ¶ 52.

properties. *Id.* Members of the DTO illegally sold the cocaine to Mexican drug traffickers in Guatemala knowing that it would be further distributed in the United States. *Id.*

In directing where shipments of cocaine would be stored and directing the actions of his co-conspirators, Defendant was a leader of the DTO, which involved five or more participants, at least during part of the time period of the charged conspiracy. Am. PSR ¶ 18. At other times, his sons took the lead in planning and organizing the shipments, but Defendant continued to receive a portion of the payments his sons and co-conspirators received. *Id.* The total amount of cocaine involved in this drug trafficking activity exceeded 450 kilograms. Am. PSR ¶ 70.

## III. Legal Standards

### A. Leadership Enhancement

Pursuant to Section 3B1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), a defendant is subject to a four level increase in his offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). If a defendant was a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," the defendant is subject to a three level increase in his offense level. A two level enhancement is applicable when a defendant was an organizer, leader, manager or supervisor in a criminal activity other than an activity described in subsection (a) or (b) above. U.S.S.G. § 3B1.1 (c).

This sentencing enhancement requires a preponderance of the evidence, *see United States v. Thomas*, 114 F. 3d 228, 261 (D.C. Cir. 1997), *cert. denied*, 522 U.S. 1033 (1997) but circumstantial evidence is sufficient, *United States v. Layeni*, 90 F.3d 514, 524 (D.C. Cir. 1996), *cert. denied*, 519 U.S. 1099 (1997). Upon finding that the government has met its burden of

proving the requisite facts, the district court must apply the appropriate adjustment and has no discretion to decide whether to apply Section 3B1.1. *See United States v. Christian*, 804 F.3d 819, 822 (6th Cir. 2015) ("Once a sentencing court makes a factual finding as to the applicability of a particular adjustment provision, the court has no discretion, but must increase the offense level by the amount called for in the applicable provision.") (quoting *United States v. Feinman*, 930 F.2d 495, 500 (6th Cir. 1991); *United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003) ("Once this management or supervision is found, the adjustment is mandatory.")

The Application Notes to the Guidelines instruct that "[f]actors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offence, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, App., Cmt.n.4. It also instructs that"[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id.*

This sentencing enhancement is appropriate where the defendant exercises control over one or more participants in a criminal activity involving at least five persons, *United States v. Wilson*, 240 F.3d 39, 47-49 (D.C. Cir. 2001), although the defendant may be counted among the five, *United States v. Brodie*, 524 F. 3d 259, 270 (D.C. Cir. 2008). The defendant need not have exercised control over each conspirator. *See United States v. Batista*, 684 F.3d 333, 346 (2nd Cir. 2012) (finding that the defendant's control over one person, who gave orders to other lower ranking members, justified the four-level sentencing enhancement). This Circuit has indicated that the greater a defendant's level of control or responsibility, the more culpability the Defendant has, which justifies a longer sentence and imposition of the enhancement. *United States v. Graham*,

162 F.3d 1180, 1185 (D.C. Cir. 1998) (differentiating between defendants based on "relative responsibility.")

The leadership enhancement may be warranted where a defendant has decision-making authority, enjoys a larger share of the profits than other co-conspirators, and recruits participants for the criminal activity. *See, e.g., United States v. Baylor*, 97 F.3d 542, 548 (D.C. Cir. 1996) (finding that the defendant "exercised control over and organized the activities of at least one other person involved in distributing drugs"); *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994) (finding that defendant recruited participants and took all the proceeds).

**B. Use of Aircraft Enhancement**

Pursuant to Section 2D1.1(b)(2)(A) of the Sentencing Guidelines, a two level increase in the offense level is authorized "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which . . . an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance." U.S.S.G. § 2D1.1(b)(2)(A). This section has been applied even where the private plane is not used to move drugs across the American border (the final stage of importation), but rather when drug traffickers have used private planes to pick up drugs and transport them from one country to another country as part of an overall scheme to import drugs into this country.

Importing controlled substances is often an intricate process involving multiple stages, and a plain reading of section 2D1.1(b) does not indicate that the increase applies only if an aircraft is used in the *final* border crossing stage of that process. For example, in *United States v. Iacullo*, "a private plane was used several times to pick up cocaine in Colombia and fly it to the Bahamas, while the cocaine was en route to this country," and the court found that under these circumstances, "it is clear that a private plane 'was used,' within the meaning of § 2D1.1(b)(2)(A), during the

importation scheme, of which [defendant] was an active participant." *United States v. Iacullo*, 140 Fed. App'x.94, 102 (11th Cir. 2005), *cert. denied*, 546 U.S. 1008 (2005). *But see United States v. Joelson*, 7 F.3d 174, 180 (9th Cir. 1993) (vacating a district court's application of the enhancement where a private plane flew cocaine to Guatemala, but a commercial air carrier was used to actually bring the drugs across the American border), *cert. denied*, 510 U.S. 1019 (1993).

These two cases cannot be reconciled. Ultimately, the Court finds that Eleventh Circuit's interpretation of Section 2D1.1(b) in *Iacullo* more convincing because it better reflects the plain meaning of the text of the guideline. As stated above, Section 2D1.1(b) authorizes an increase "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which . . . an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance." The Ninth Circuit's narrow interpretation is not required by the plain meaning of the text. Where, as here, drugs are conveyed by non-commercial aircraft as part of an importation scheme while they are en route to the United States, the aircraft can be said to be "used" to import drugs even if it is not the ultimate conveyance of the drug across the American border.

## IV. <u>Argument</u>

### A. <u>The Defendant Should Receive a Sentencing Enhancement Because He Qualifies as an Organizer or Leader of the DTO</u>

The Government argues that Defendant's conduct qualifies for application of the leadership role adjustment because he had "significant decision making authority over a DTO that involved five or more participants, was deeply involved in the offense and recruited other members." Govt.'s Mot. for Sentencing Enhancements, ECF No. 1096, at 6. As a preliminary matter, Defendant contests the Government's proposed sentencing enhancements on grounds that:

> On the record before it, the Court cannot make a determination as to the applicability of the enhancements sought by the government. The government's various transcript excerpts of Herrera[-]Garcia's and Linares[-]Cordon's testimony and their proffers are plainly insufficient because the Court cannot make a finding of reliability as to Mr. Lorenzana based solely on them. That the government relies entirely on the uncorroborated testimony of Herrera[-]Garcia concerning alleged discussions with Mr. Lorenzana to support a role enhancement should raise concerns for the Court. Mr. Lorenzana denies any discussions with Herrera[-]Garcia and denies that he was a leader or organizer of the criminal activity involving his sons.

Defendant's Memorandum in Aid of Sentencing, ECF No. 1108, at 3. As previously noted, this Court upheld the use of trial transcript excerpts in lieu of live witnesses on grounds that hearsay evidence may be used at sentencing if the evidence is reliable and the defendant has the opportunity to challenge it. This judicial officer presided over the trial of Defendant's sons and is able to assess the credibility of the witnesses at issue. The Court has determined that their testimony was credible. Defendant was notified of the excerpts upon which the Government intended to rely, and he was permitted to proffer his own evidence in support of his position, including witnesses who would have been permitted to participate in an evidentiary hearing, but Defendant has not proffered witnesses.

Defendant asserts that "[b]eyond receiving payment for letting his sons use his property to store the cocaine, [he] denies that he ever authorized, directed or otherwise had a supervisory role over what his sons were doing." Def.'s Mem. in Aid of Sentencing, ECF No. 1108, at 7. Defendant acknowledges knowing what his sons were doing but challenges his designation as a leader or organizer of the criminal activity.

The Government relies upon evidence from the trial of co-defendants Waldemar Lorenzana-Cordon and Eliu Lorenzana-Cordon to demonstrate the Defendant "engaged in high-level negotiations and [exercised substantial] decision-making about the direction and investments of the conspiracy" and "gave orders and instructions to his sons and others as to where and when

loads of cocaine should be received, inventoried, and stored. . ." Govt.'s Mot. for Sentencing Enhancements, ECF No. 1096, at 6-7.

The Government asserts that both Herrera-Garcia and Linares-Cordon acknowledged Mr. Lorenzana-Lima as leader of the DTO and furthermore, Defendant's sons would also "wait to make decisions until they discussed the venture with their father, . . . , and ultimately received his permission." Govt.'s Mot. for Sentencing Enhancements, ECF No. 1096, at 7. *See* Trial Transcript ("Tr.") 3/1/16 p.m. at 26-27 (Ex. 1) (Herrera-Garcia described how he met with Defendant's son Haroldo and told him about a proposition requiring "an airfield property where we could store and safeguard cocaine shipments and be able to secure them until the Mexican drug traffickers could come pick them up," and Haroldo indicated that he "had to ask his father about the situation before he said yes."); Tr. 3/1/16p.m. at 27-31 (Herrera-Garcia described a meeting with Defendant where Defendant tried to sell him a cattle ranch but he reiterated the proposal he had made earlier to Haroldo regarding his need for property to safeguard the cocaine and an airfield, and Defendant indicated he had to "think about it" and later agreed that operations could start). *See also* Tr. 3/1/16 p.m. at 36-37 (Ex. 3) (Herrera-Garcia informed Haroldo that the Mexican drug cartels wanted to "up the loads, the flow of cocaine, the shipments," and Haroldo responded that "[they] needed to talk to his father because his father was not very happy with what was going on [because they] had been working a little bit too much [receiving inloads too often]."

Defendant was "concerned that the numerous amounts of loads were going to bring [legal] problems, . . , to his property and to his family." *Id.* at 37. Defendant suggested that they "slow down" and wait until they could find a "better place to restart operations." *Id.* As a result, the three of them {Herrera-Garcia, Haroldo, and Defendant] started looking for "second options." *Id.* at 37-38. After starting operations at a new location, an airplane filled with cocaine crashed at that

property, and Defendant ordered that operations should cease until they could find a new location. Herrera-Garcia explained that Defendant "was not very happy for what had happened" because the "plane crash was going to bring a lot of investigation." *See* Tr. 3/1/16 p.m. at 48-49 (Ex. 4) Defendant "didn't like the way things were handled," and he instructed Herrera-Garcia and Haroldo that they "could not do anything else in the area" until they waited for the reaction, and Herrera-Garcia and Haroldo followed that advice. *Id.* They slowed down and started looking for another airfield. *Id.* at 49.

In an attempt to counter the Government's argument that Defendant was an organizer or leader, Defendant cites to various portions of the trial transcripts where Herrera-Garcia and Linares-Cordon dealt directly with Defendant's son Haroldo (and sometimes with Defendant's other sons). *See generally* Def.'s Mem. in Aid of Sentencing, ECF No. 1108, at 7-9 (citing multiple references to the Trial Transcript). The Government acknowledges that Herrera-Garcia worked with Defendant's three sons to traffic cocaine through the Lorenzana properties in Guatemala, but the Government contends that while the four Lorenzanas handled planning and logistics, it was Defendant who "authorized the work, and designated what property would receive the plane or trucks and store the cocaine." Govt.'s Mot. for Sentencing Enhancements, ECF No. 1096, at 7-8. *See, e.g.*, Tr. 3/1/16 p.m. at 31 (Ex. 1) (Herrera-Garcia testified that the "only requirement[] from [Defendant] was that he would . . . call the day . . . , and he would let us know when it could be done," or in other words, he had the final authority to "authorize a day - - the day or the time that [the drug trafficking related activities] could be done."). Defendant also determined the distribution of work among his sons. *See* Tr. 3/3/16 p.m. at 64-65 (Ex. 2) (Herrera-Garcia testified that "the pitch [to involve the Lorenzana family in drug trafficking activities] came through their

father" and "Waldemar Lorenzana Senior and [Herrera-Garcia] agreed to start moving jobs in between them [the three sons].")

There is additional evidence of Defendant's leadership role insofar as he decided the roles his sons should play; for example, indicating to Herrera-Garcia that his son Eliu should be more involved in the DTO, because he was a "thinking person" and Defendant wanted to be sure that "things were going to be done correctly." *See* Tr. 3/1/16 p.m. at 50-51 (Ex.4.) Furthermore, Defendant determined the property on which Herrera-Garcia was to coordinate delivery of the cocaine. After Herrera-Garcia had a meeting in El Salvador about bringing in cocaine using larger trucks, he met with Defendant and sons Eliu and Haroldo, and Defendant suggested using a different location at an old warehouse because of concerns about how it would look with the big trucks coming in. *See* Tr. 3/2/16 a.m. at 24-25 (Ex. 6). Because the warehouse designated by Defendant was too small, Defendant instructed that the warehouse be remodeled to the size they needed for use with the trucks. *Id.* at 25. Herrera-Garcia reached an agreement with Defendant and son Eliu that "basically there was a change on who things were going to be done with[,] or it was decided [by Defendant and Herrera-Garcia] that if any shipment came into El Llano, it would directly be handled by Eliu Lorenzana [while] [a]nything that had to do with La Calera had to do with Haroldo." *Id.* at 27. The cocaine going to the Mexican cartels would be stored and safeguarded before being picked up, and [w]hat was left of the shipment would be turned into them [his sons] for them to sell. *Id.*

The Government contends further that Defendant demonstrated his leadership through his connections to law enforcement, which facilitated trafficking by the DTO. *See* Tr. 3/1/16 p.m. at 81-82 (Ex. 19) (discussing how Herrera-Garcia gave Defendant money "to resolve the situation" with the police and "pay off the authorities" after Eliu got arrested).

This testimony cited by the Government makes it clear that Defendant played a leadership role in a conspiracy which involved at least five participants, including his sons and other co-conspirators. Defendant "devis[ed] a criminal scheme, provid[ed] the wherewithal to accomplish the criminal objective, and coordinat[ed] and overs[aw] the implementation of the conspiracy." *United States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997). Defendant approved his sons' involvement and the property to be used and modifications thereon. He was seen by his co-conspirators as the leader and point-person in control. The operation was complex and involved trafficking tons of cocaine from Colombia to Guatemala through other locations, with the drugs then transported into Mexico and the United States for further distribution. The DTO utilized planes, trucks, landing strips and warehouse storage facilities, and the amount of money involved equated to millions of dollars. See Govt.'s Mot. for Sentencing Enhancements, ECF No. 1096, at 11-12 (citing multiple transcript excerpts of testimony by Herrera-Garcia and Linares-Cordon [who served as an accountant for the DTO] describing the volume of cocaine being trafficked through the Lorenzana properties and the prices and percentages paid to Defendant's sons); *see generally* Tr. 3/2/16 a.m. at 34-35 (Ex. 7); Tr. 3/1/16 p.m. at 32-35 (Ex. 8); Tr. 3/1/16 p.s. at 42 (Ex. 9); Tr. 3/1/16 p.m. at 52 (Ex. 10); Tr. 3/1/16 p.m. at 56 (Tr. 11); Tr. 3/2/16 a.m. at 15, 64 (Ex. 12); Tr. 3/2/16 a.m. at 28 (Ex. 13); Tr. 3/2/16 p.m. at 33-34 (Ex. 14); Tr. 2/23/16 p.m. at 47 (Ex. 15); Tr. 3/2/16 a.m. at 31 (Ex. 16). Defendant has admitted to knowing what his sons were doing and receiving payments for letting his sons use his property to store the cocaine. *See* Def.'s Mem. in Aid of Sentencing, ECF No. 1108, at 7.

The fact that Defendant's sons were also been found to be organizers or leaders does not undercut the fact that Defendant qualifies as such, as U.S.S.G. § 3B1.1 specifically provides that there can be more than one person who qualifies as an organizer or leader of a criminal

organization for purposes of sentencing guideline enhancements. *See* U.S.S.G.§ 3B1.1, App. Note 4. In the instant case, Defendant's sons controlled aspects of the operations of the DTO, while there is evidence [cited above] that Defendant had final authority over the operations and should thus be considered an organizer or leader. *See United States v. Yeh*, 278 F.3d 9, 13 (D.C. Cir. 2002) (where defendant was claimed that he could not have been a leader because others had responsibility on a ship importing drugs into the United States, the court found that even though the defendant shared power with others, he was a leader as they were still subordinate to him). In this case, while Defendant did not oversee the day-to-day operations, he decided which sons and properties would be used for elements of the DTO enterprise and his was the ultimate authority.

The Government notes further that Defendant need not have exercised his leadership over the entire length of the conspiracy because this is not required by the "plain language [of] U.S.S.G. § 3B1.1," *see* Govt.'s Mot. for Sentencing Enhancements, ECF No. 1096, at 14, where the Guideline notes explain that, when considering imposing enhancements, more than one person can qualify as an organizer or leader, and sentencing courts should consider "all persons involved" during the "course of the entire offense." U.S.S.G. § 3B1.1, App. Note 4. As previously noted, Defendant reported that he had a heart attack and surgery in 2006, and as a result, the Court acknowledges that he may have played a less active role in the DTO leading up to and after that time.

The Court has explained in detail why the record in this case supports a sentencing enhancement for Defendant's leadership role in a conspiracy which involved at least five participants. Defendant's denial that he ever authorized, directed or otherwise had a supervisory role over what his sons were doing," Def.'s Mem. in Aid of Sentencing, ECF No. 1108, at 7, is belied by the evidence in this case. As illustrated by the testimony of Herrera-Garcia and Linares-

Cordon — who were witnesses during the trial of Eliu Elixander Lorenzana-Cordon and Waldemar Lorenzana- Cordon, during which the undersigned presided as the judge — this Defendant was the organizer and leader of a long-running DTO that trafficked large quantities of cocaine from Colombia to Guatemala and then through Mexico and into the United States, which resulted in significant sums of money from that trafficking. The evidence demonstrates that Defendant exercised substantial decision-making authority and gave orders and instructions to his sons and others as to where and when loads of cocaine should be received and stored in a manner to avoid detection by law enforcement. Defendant was acknowledged to be the leader of the DTO, and both Herrera-Garcia and Linares-Cordon deferred to him, as did his sons. Defendant acknowledges that he knew what his sons were doing and received payment for letting them use his property to store cocaine. Accordingly, Defendant's arguments that he was not an organizer or leader are rejected. The sentencing enhancement for organizers and leaders is applicable in this case.

**B. <u>The Defendant Should Receive a Sentencing Enhancement Because His DTO Used Aircraft During the Conspiracy</u>**

The Government suggests a two level increase in the offense level computation because the evidence shows that the Defendant's DTO "unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance . . . " U.S.S.G. § 2D1.1(b)(2)(A).

This increase is appropriately applied in this case even though the record does not indicate that Defendant's DTO used an aircraft to accomplish the final stage of importation - the crossing of the United States border. The record shows that for years, the DTO used aircraft as part of its

overall efforts to import cocaine into the United States. *See, e.g.*, Tr. 2/23/16 a.m. at 100-102-20 (Ex. 20) (Linares-Cordon testified about aerial shipments that occurred while he was serving as a lookout); Tr. 2/23/16 p.m. at 19-20 (Ex. 21) (Linares-Cordon knew that the Lorenzanas continued to receive limited aerial shipments from 2001-2003). Mr. Herrera-Garcia testified that his relationship with the Lorenzanas commenced when he was searching for land suitable for incoming airplanes. *See* Tr. 3/1/16 p, .m. at 26-31 (Ex. 1) (The Mexican traffickers requested a "person that could provide an airfield property where we could store and safeguard cocaine shipments and be able to secure them until the Mexican drug traffickers could come pick them up."); Tr. 3/1/16 p.m. at 30 (The Lorenzanas would provide "the airfield . . . the property to safeguard the cocaine . . . [and] make sure it [the cocaine] was secure."). As previously noted, Defendant stated that he needed to consider Herrera-Garcia's proposal, and he ultimately consented. *See id.* at 31. Use of aircraft was frequently mentioned in conversations between Herrera-Garcia and Defendant. *See* Tr. 3/1/16 p.m. at 36-42 (Ex. 3) (Herrera-Garcia informed Defendant that the Mexicans wanted to increase the frequency and amounts of cocaine shipments and Defendant noted concerns about the increased air traffic at the property, and he, Haroldo, and Herrera-Garcia began searching for other properties). Defendant knew that Herrera-Garcia was using the Lorenzana properties for airplane shipments because Defendant was present when they inspected properties, such as one called *El Llano*, which they decided was too small for an airfield, and another called *La Melonera*, which they decided to use. *See id.* (Ex. 3). In discussing *La Melonera*, Herrera-Garcia testified that "we were going to use one of the roads, one of the dirt roads, accommodated, you know, for an air strip and use it for landing an aircraft." *Id.* at 40-41 (Ex. 3). Furthermore, Defendant was aware that an airplane crashed at that property and he ordered operations to temporarily cease until they found another location. Tr. 3/1/16 a.m. at 48-51 (Ex. 4).

Defendant, Haroldo and Herrera-Garcia then tried to "find a different airfield," and they decided to use another property, *Los Conejos*. *Id.* at 49-50.

Defendant does not specifically address the use of an aircraft enhancement in his Memorandum in Aid of Sentencing, instead relying on his claims that the witness testimony by Herrera-Garcia and Linares-Cordon is inherently unreliable. In light of the record before this Court, the Defendant cannot claim ignorance as to the use of the aircraft based on testimony by both Herrera-Garcia and Linares-Cordon. which involved discussions about cocaine-filled airplanes landing on suitable airstrips on the Defendant's properties and the need for additional properties to handle the increased traffic. *See generally United States v. Bethancourt*, 65 F.3d 1074, 1081 (3rd Cir. 1995) (affirming the imposition of the use of aircraft enhancement despite the defendant's argument that it was not foreseeable or in furtherance of the conspiracy). The evidence in this case supports that fact that aircraft were used as part of the drug trafficking scheme in which the Defendant participated, and accordingly, application of this use of an aircraft enhancement is well-supported in this case.

For the reasons set forth above, it is this 21st day of February, 2020, hereby

**ORDERED** that the Government's [1096] Motion for Sentencing Enhancements is GRANTED. Defendant Waldemar Lorenzana-Lima is subject to a sentencing enhancement for being an organizer or leader of a drug conspiracy involving five or more participants under U.S.S.G. § 3B1.1(a) because the evidence establishes Defendant's role as a leader who had significant decision-making authority over persons involved in the Drug Trafficking Organization. Defendant is subject further to a two-level enhancement for use of an aircraft other than a regularly-scheduled commercial air carrier to import controlled substances pursuant to U.S.S.G. §

2D1.1(b)(2)(A) because the evidence establishes that Defendant and his co-conspirators used private aircraft during the conspiracy to import multi-hundred kilogram quantities of cocaine, which was stored at the Defendant's properties.

______________/s/__________________
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE